# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:10-cv-23527-AJ

PIETRO CARENZA, an individual, et al.,

      Plaintiffs,

v.

FOUR SEASONS HOTEL LIMITED, a
Canadian Corporation, et al.,

      Defendants.

                          /

GLK, L.P., a Washington limited partnership, et
al.,

      Plaintiffs,

v.

FOUR SEASONS HOTEL LIMITED, a
Canadian Corporation, et al.,

      Defendants.

## FOURTH AMENDED CONSOLIDATED COMPLAINT

Through this Fourth Amended Consolidated Complaint, Plaintiffs, Pietro Carenza

("Carenza"), Nancy Baron ("Baron"), Gianluca Piredda ("Piredda") Glendaris, LLC

("Glendaris"), GLK, L.P. ("GLK") and Emanuel Organek ("Organek") (Carenza, Baron,

Piredda, Glendaris, GLK and Organek, together, the "Plaintiffs") sue Defendants Four Seasons

Hotel Limited, (the "Four Seasons" or "FS"), Terremark Brickell II, Ltd. ("Terremark"),

Millennium Partners, LLC ("Millennium") and FSM Hotel, LLC ("FSM") (the Four Seasons,

1

Terremark Brickell II, Ltd. and Millennium Partners are together referred to herein as "Defendants"), and allege:

## NATURE OF THE CASE

1.      This complaint seeks damages, injunctive and equitable relief from Defendants as a result of their inducing Plaintiffs into purchasing Hotel Condominium Units in the Four Seasons Tower under false pretenses and thereafter failing to perform their contractual and fiduciary obligations, and alleges:

(a)     Violation Of The Florida Deceptive And Unfair Trade Practices Act  (Counts I-II);

(b)     Misleading Advertising – Violation Of Fla. Stat. § 817.41  (Counts III-IV);

(c)     Fraudulent Inducement  (Counts V-VI);

(d)     Breach Of Contract  (Counts VII-VIII);

(e)     Breach Of The Covenant Of Good Faith And Fair Dealing (Counts IX-X)

(f)     Breach Of Fiduciary Duty (Counts XI-XII)

(g)     Civil Conspiracy (Count XIII); and

(h)     Declaratory Relief (Count XIV).

## JURISDICTION, VENUE, AND THE PARTIES

2.      Pursuant to § 26.012, Fla. Stat., the Miami-Dade Circuit Court has subject matter jurisdiction because this is an action seeking equitable relief, and because Plaintiff is seeking damages, exclusive of attorneys' fees and costs, in excess of $15,000.00.

3.      This Court currently has subject matter jurisdiction based upon the Lanham Act claims which were part of the pending Third Amended Consolidated Complaint.  Because the Lanham Act claims have been withdrawn and no federal question remains pending, and because

diversity jurisdiction does not exist in this action, there is no sound basis for this Court to exercise ongoing jurisdiction over this matter. This Complaint is subject to a renewed motion to remand filed simultaneously herewith.

4.      This Court, as well as the Miami-Dade Circuit Court, have personal jurisdiction over the Defendants because they reside in Florida, or operate, conduct, engage in, or carry on a business or business venture in this state, or have an office or agency in this state, and because Defendants breached a contract in this state.

5.      Venue is proper because the causes of action accrued in Miami-Dade County, and the real property at issue is located in Miami-Dade County.

6.      Plaintiff Organek is an individual residing in Palm Beach County, Florida and is *sui juris*.

7.      Plaintiff GLK is a limited partnership organized and existing under the laws of the State of Washington and maintains its principal place of business in Palm Beach County, Florida.

8.      Plaintiff Carenza is an individual residing in Switzerland and is *sui juris*.

9.      Plaintiff Baron is an individual residing in Switzerland and is *sui juris*.

10.     Plaintiff Piredda is an individual residing in Italy and is *sui juris*.

11.     Plaintiff Glendaris is a limited liability company organized and existing under the laws of the State of Delaware.

12.     Carenza is a director of Glendaris and at all relevant times was authorized to act on behalf of Glendaris.

13.     Carenza is an agent of Piredda and at all relevant times was authorized to act on behalf of Piredda.

14.     Carenza is an agent of and the husband of Baron, and at all relevant times was

authorized to act on her behalf.

15.    Defendant, Four Seasons is a corporation organized and existing under the laws of the Province of Ontario and maintains its principal place of business in Toronto, Canada and has offices in Miami, Florida.

16.    Defendant, Millennium, is a limited liability company organized and existing under the laws of New York and maintains its principal place of business in New York, New York.

17.    Defendant FSM is a limited liability company organized and exisitng under the laws of Delaware and maintains its principal place of business designated as "c/o Millennium Partners," in New York, New York.

18.    Defendant, Terremark is a limited partnership organized and existing under the laws of the State of Florida and maintains offices in New York, New York and Miami, Florida.

19.    Terremark and FSM were established by the principals of Millennium, all three of which are affiliated entities and have common ownership.

20.    Terremark was the owner and developer of a hotel and condominium complex located in Miami-Dade County, Florida described in its Declaration of Covenants, Restrictions and Easements ("Terremark's Declaration") as the Millennium Tower Project and marketed as the Four Seasons Tower (the "Project").

21.    Through Terremark's Declaration, Terremark anticipated and eventually created seven (7) separate lots, four of which became the "Hotel Lot," the other three of which became the "Condominium Hotel Lot," the "Residences Lot," and the "Garage Lot."

22.    Terremark entered into a Hotel Management Agreement with Four Seasons through which Four Seasons is obligated to and at all relevant times did manage the luxury hotel

4

known as the "Four Seasons Hotel Miami" (the "Hotel") and Hotel Condominium Units.

23.    Pursuant to a Land Trust Agreement, Terremark transferred beneficial ownership of the Hotel Lot to FSM for 100 years from the date of that agreement.

24.    FSM assumed responsibility and liability for all of the acts alleged herein that were performed by Terremark.

## II.    GENERAL ALLEGATIONS

### A.    The Four Seasons Tower – The Desire To Recoup Their Capital Investments Motivated Defendants to Mislead Plaintiffs

25.    Developing the Four Seasons Tower (the "Project") required a substantial amount of capital.

26.    Terremark divided the Project into three use classifications: (a) approximately 221 hotel units (the "Hotel Units"), (b) 84 hotel condominium units (the "Hotel Condominium Units"), and (c) a substantial number of private condominium residences (the "Private Condominiums").

27.    By combining the Hotel with privately-owned condominium units, including the Hotel Condominium Units, Terremark and its parent company Millennium, were able to use the proceeds from the sale of condominium units to raise capital for construction and other operating costs and/or to retire debt.

28.    Having invested a substantial amount of capital into the Project, Terremark and Millennium had a very strong motive to say and do all that was necessary to close sales of the Hotel Condominium Units.

29.    As more specifically set forth below, each of the Plaintiffs purchased Hotel Condominium Units from Terremark.

### B.    Terremark and Millennium Used False and Misleading Marketing

## Information to Induce Plaintiffs to Purchase Hotel Condominium Units

a.      Defendants Used Four Seasons' Reputation to Induce Plaintiffs to Purchase Hotel Condominium Units

30.    With regard to the marketing campaign discussed below, the employees and agents of Terremark, Millennium and the Four Seasons all held themselves out to Plaintiffs as representatives of one another.  The Defendants worked in unison, and it was often impossible to understand or know for whom a particular representative spoke.  Prior to and following Plaintiffs' purchase of their respective Hotel Condominium Units, Plaintiffs were provided with business cards from representatives of Millennium and Four Seasons.  Linda McKenzie, the Contract/Closing Administrator provided Plaintiffs with her Four Seasons and Millennium Partners business card, further blurring any distinction between the Defendants.

31.    Defendants' marketing campaign relied heavily on the Four Seasons' reputation for successfully owning and operating luxury hotels, and its reputation for operating a professional and ethical business.

32.    Four Seasons, actively promotes its reputation for fair dealing by asserting that its "guiding principle is the Golden Rule – to treat others as you wish to be treated:"

> *At Four Seasons, corporate values are much more than a programme or a policy – they define who we are and inform the decisions we make.* <u>The company's guiding principle is the Golden Rule – to treat others as you wish to be treated –</u> and as such, Four Seasons strives to have a long-lasting, positive influence on the communities where we operate and on the people we employ and serve around the world. We believe that this goal is integral to our success as a company. This commitment is expressed consistently in our actions through three main areas of focus. By acting in a manner consistent with our corporate values, Four Seasons will continue to seek opportunities to enrich and contribute positively to the global community.

*See* http://www.fourseasons.com/about_us/corporate_values/.  (Underlining added).

33.    But for Plaintiffs' strong belief, fostered by the Four Seasons, that the Four

Seasons was an honest and ethical member of the business community, and that it associated itself with similar businesses, Plaintiffs would not have purchased their respective Hotel Condominium Units.

      b.    <u>Defendants Provided False and Misleading Information to Plaintiffs</u>

     34.    Terremark and Millennium used unfair and deceptive marketing techniques to induce Plaintiffs to purchase their respective Hotel Condominium Units under false pretenses, including disseminating false and misleading information, and by intentionally refusing to provide material information.

     35.    From its inception, the Condominium Hotel Units were marketed by all Defendants (which all wore each other's "hats") with a strong emphasis that the Hotel Condominium Units would be income producing properties, and by asserting that the Hotel Condominium Units would be a part of an elite Four Seasons Hotel.  As part of their fraudulent and misleading marketing campaign, Defendants:

     (a)    Told Plaintiffs that the Hotel Condominium Units would be part of the "Four Seasons Hotel" pursuant to a rental program agreement through which the Hotel Condominium Units would be rented by the Four Seasons; conversely, Defendants emphasized that the Private Condominium Units would not be eligible to participate in the Four Seasons rental program nor would they be part of the Four Seasons Hotel;

     (b)    Provided Plaintiffs with baseball hats, champagne glasses, bathrobes and other marketing material bearing the Four Seasons' trademarks.

     (c)    Falsely stated that Florida law prevented Defendants from providing Plaintiffs with a copy of the Rental Program Agreement (the "RPA") prior to closing, and refused to provide Plaintiffs with the Rental Program Agreement (the "RPA") until after they closed;

(d)     In direct response to Plaintiffs' inquires about the material terms of the RPA, Defendants' agents Edgar Gutierrez, Linda McKenzie and Analisa Arcacha falsely asserted that in consideration for 20% of the rental revenue from the Hotel Condominium Units, the Four Seasons would market and operate their units as if they were a part of the Four Seasons Hotel:

I.      Indeed, prior to closing on the sales of their Hotel Condominium Units, Carenza, Glendaris and Piredda were provided with a document entitled, "Four Seasons Miami Rental Program – Funds & Cost Responsibility Outline" which discussed the "eighty-twenty" split of adjusted income resulting from rentals of Plaintiffs' units, as well as the Defendants' responsibilities with respect to this investment property. A copy is attached as Exhibit 1. Specifically, as part of the 20% to be paid to Terremark, FSM and/or Four Seasons, the Funds & Cost Responsibility Outline provided that the Four Seasons was specifically responsible for, "Sales and Marketing," "Reservations System," "Hiring and Training," "Other operating expenses" and the Management Fee payable to the Four Seasons;

II.     Additionally, prior to closing on the sales of the Units, Carenza, Glendaris and Piredda were provided with a document entitled "Summary of Rental Program Agreement," pursuant to which the Four Seasons was "responsible for the management of the Rental Program, including sales and marketing services; operation of a reservations system; check-in and check out services, accounting, bookkeeping and reporting activities; and hiring training and supervision of employees engaged in Rental Program activities..." A copy is attached as Exhibit 2.

III.    Defendants, through their agents, Linda McKenzie and Analisa Arcacha, specifically conveyed to Carenza, Glendaris and Piredda that the Hotel Condominium Units were an investment with a return to be made, and that while the specific dollar amount of the return

was not guaranteed, a return based upon the "eighty-twenty" was promised by Millennium, FSM and Terremark. Moreover, post-closing estimates of returns were provided by Defendants.

(e)     Intentionally failed to tell Plaintiffs that the Four Seasons only intended to rent the Condominium Hotel Units if and when necessary to accommodate long term rentals and overflow guests from the Hotel;

(f)     Intentionally failed to tell Plaintiffs the Condominium Hotel Units would not be easily found on the Four Seasons website;

(g)     Intentionally failed to tell Plaintiffs the Hotel Condominium Units would not be on the Global Distribution System (the "GDS") or advertised on websites such as Expedia.com, Hotel.com, and Travelocity.com, etc.;

(h)     Intentionally failed to tell Plaintiffs that the Hotel Condominium Units would not be marketed and advertised in the same manner that the Hotel Units would be marketed and advertised.

(i)     Fraudulently implied that the 20% would be sufficient to cover the cost of marketing and advertising the Hotel Condominium Units in the same manner as the Hotel Units, prior to closing, (despite knowing 40% or more was standard for Four Seasons' other Hotel/Condominium Hotel Units projects around the world);

(j)     Demanded, after the closing, that Plaintiffs pay 40% of the revenue from the rentals of their respective Hotel Condominium Units if Plaintiffs wanted their Hotel Condominium Units marketed in the same manner as the Hotel Units, thereby performing the last step in their bait-and-switch marketing campaign;

(k)     Intentionally failed to tell Plaintiffs the Hotel Condominium Units would not be able to be booked by a potential lodger through the Central Reservation Office nor on the Four

Seasons website;

(l)     Intentionally failed to tell Plaintiffs that the actual pricing of the Condominium Hotel Units would be unavailable to the public and to the Hotel Condominium Unit Owners;

(m)     Intentionally failed to tell Plaintiffs that the Hotel Condominium Units would be deliberately priced so much higher than comparable Hotel Units that it would not be economically rational for a prospective lodger to rent a Hotel Condominium Unit;

(n)     Intentionally failed to tell Plaintiffs the Hotel Condominium Units would be used for low paying lodgers while higher paying lodgers would be placed in the Hotel Units;

(o)     Intentionally failed to tell Plaintiffs the Hotel Condominium Units would be used primarily for "long term rentals," (a term which the General Manager and designated corporate representative of the Four Seasons Hotel Miami cannot even define) and overflow;

(p)     Intentionally failed to tell Plaintiffs there would not be any training for employees or the General Manager specific to the Hotel Condominium Units or Rental Program Agreement;

(q)     Intentionally failed to tell Plaintiffs the Four Seasons personnel and management would be incentivized to rent Hotel Units to the exclusion of Condominium Hotel Units; and

(r)     Falsely told GLK and Organek, through Edgar Gutierrez, that the Hotel did not have any two bedroom Hotel Units, and that there were fewer one bedroom Hotel Units than actually exist; thus, Defendants misrepresented the potential for and scope of competition between the Hotel Units and the Hotel Condominium Units.

36.     But for the false and misleading advertising materials and omissions, Plaintiffs would not have purchased their respective Hotel Condominium Units.

37.     Terremark, Millennium and the Four Seasons knew that each of the Plaintiffs was purchasing their respective Condominium Hotel Units with the intention that their units would be

income producing properties.

38.     Defendants intentionally provided a false basis for not providing the RPA to Plaintiffs because the Defendants knew that had Plaintiffs been given a copy of the RPA prior to closing that they would not have purchased their respective Hotel Condominium Units.

39.     Each of the Plaintiffs purchased their respective Condominium Hotel Units, and the otherwise unnecessarily expensive furniture, fixtures and equipment associated with it, with the reasonable expectation, based upon Defendants' material statements and omissions, that their Hotel Condominium Units would be marketed, advertised and otherwise treated like any other hotel room in the Four Seasons Hotel, except that Carenza, Piredda and Glendaris were provided with a piece of paper indicating that the Hotel Units would be given "priority" over the Hotel Condominium Units.  Notably, Organek and GLK were not informed that the Defendants intended to give the Hotel Units "priority" over the Hotel Condominium Units until after they had closed on their Hotel Condominium Units.

40.     Among other reasons, the Defendants deliberately concealed these facts and provided misleading information and documents to the Plaintiffs to induce them into buying their respective Hotel Condominium Units so that Terremark would have additional capital available to complete construction, cover operating expenses and to retire debt more quickly than it would otherwise be able to do.

     c.     Defendants Guaranteed Mr. Organek a Return In An Effort To Mislead Mr. Organek and GLK Into Buying Their Units As An Investment Property

41.     Prior to the closing, Defendants knew that Organek and GLK were purchasing their Hotel Condominium Units as an investment pursuant to a 1031 exchange.

42.     Prior to closing, Terremark negotiated, and at closing, executed the Amended and Restated Guarantee Agreement in favor of Organek and GLK "for the purpose of guaranteeing to

buyer a certain amount of rental income for the GLK Units and the Emanuel Units." A copy is attached as Exhibit 3. Defendants told Mr. Organek and GLK, who were among the earliest buyers of Condominium Hotel Units, that the Amended and Restated Guarantee Agreement would help get them through the "ramp-up" phase of the Project.

43.     By providing Organek and GLK with estimates of returns, and entering into the Amended and Restated Guarantee Agreement, Terremark intended to provide Mr. Organek and GLK with relevant information which would inform their decision as to whether to buy Hotel Condominium Units.

44.     The projected returns and the Amended and Restated Guarantee Agreement provided to Organek and GLK were relevant, material and relied upon by them, during their decision making process to purchase Hotel Condominium Units.

45.     Defendants knew or should have known that if they marketed and treated Mr. Organek and GLK's Hotel Condominium Units in the way that they were planning on marketing and treating Organek and GLK's units, that the projected rental income would not be realized.

**B.     The Plaintiffs' Purchases of Hotel Condominium Units**

46.     In July 2004, GLK purchased Hotel Condominium Unit Nos. 3003, 3101, 3107 and 3210, and Organek purchased Hotel Residence Units Nos. 3204, 3307 and 3512 in the Condominium Hotel. Copies of the Purchase Agreements are not attached because they are too voluminous, but they are in the possession, custody and control of the Defendants and are incorporated herein.

47.     In November 2005, Carenza and Baron purchased Hotel Residence Unit 3406 from Terremark pursuant to the terms of a Purchase Agreement, a copy of which is attached to the Amended Complaint as Exhibit "A," and is fully incorporated herein.

12

48.     In November 2005, Gianluca purchased Unit 3401 in the Condominium Hotel from Terremark pursuant to the terms of a Purchase Agreement, a copy of which is attached to the Amended Complaint as Exhibit "B," and is fully incorporated herein.

49.     In November 2005, Glendaris, LLC (as assignee of Ricardo Biffi), purchased Unit 3506 in the Condominium Hotel from Terremark pursuant to the terms of a Purchase Agreement, a copy of which is attached to the Amended Complaint as Exhibit "C," and is fully incorporated herein.

50.     The Purchase Agreements incorporate all responses, "to a direct inquiry from a purchaser, statements and representations regarding the ability or willingness of Terremark or its affiliates to assist Purchaser in renting the Unit."

51.     Prior to the closing, it was reasonably foreseeable, and the parties specifically contemplated, that the Plaintiffs may at some point desire to resell their Hotel Condominium Units and that the amount of rental income generated by the Hotel Condominium Units would materially affect the resale price of their units.

52.     Had Defendants marketed, rented, and otherwise managed Plaintiffs' Hotel Condominium Units in the way that they led Plaintiffs to believe they would market, rent and manage Plaintiffs' Hotel Condominium Units, then Plaintiffs' Hotel Condominium Units would have generated substantially more rental income and consequently be worth substantially more on the resale market.

**C.     Pursuant to the RPA, Plaintiffs Gave Defendants Exclusive Authority to Rent, Market and Manage Their Hotel Condominium Units**

53.     At all times, it was the intent of Millennium, Terremark, and FSM to allow Four Seasons to operate and manage the Condominium Hotel and Hotel.

54.     Immediately after the closing on the Carenza, Glendaris and Piredda Units, the

13

Four Seasons, through its employee, Julian Leon-Velarde told Carenza that he and Glendaris would realize $100,000.00 per year in profits with respect to the "06 Units," and that Piredda would earn between $60,000.00-$65,000.00 per year with respect to the "01 Unit."

55.     In reliance upon the projections provided by Defendants of the estimated profits associated with participating in the rental program, Glendaris, Carenza and Piredda signed the RPA.[1]

56.     Pursuant to the RPA, FSM agreed to assist Carenza, Glendaris and Piredda with the rental of their Units by causing the Four Seasons, as agent for FSM, to operate and manage a rental program for the Plaintiffs. *See,* RPA, p. 2.

57.     After GLK and Organek's closing, the Four Seasons and Terremark presented them with the RPA, which GLK and Organek signed in 2005.[2]

58.     Organek was shocked by the content, and realized that the real reason the RPA was not presented prior to closing was because it was so unfavorable to Hotel Condominium Unit Owners. By then, it was too late, and Organek was stuck with the Hotel Condominium Units.

59.     Pursuant to the RPA and by virtue of the transfer of the Hotel Lot from Terremark to FSM, Terremark and FSM agreed to assist GLK and Organek with the rental of their Units by causing the Four Seasons, as agent for FSM, to operate and manage a rental program for the Plaintiffs. *See,* RPA, p. 2.

60.     Pursuant to ¶ 3.1 of the RPA, the Hotel Condominium Unit owners granted FSM

---

[1]     A copy of Plaintiff Carenza and Baron's RPA is attached to the Amended Complaint as Exhibit "D," and is fully incorporated herein. A copy of Piredda's and Glendaris' RPA is attached to the Second Amended Complaint as Exhibits "E" and "F," respectively, and are fully incorporated herein.

[2]     A copy of the GLK and Organek RPAs are attached to the Complaint filed by them on July 23, 2009 in Case # 09-55032 CA 40 and are fully incorporated herein.

(and with respect to GLK and Organek, Terremark and FSM), as agent to the Hotel Condominium Unit owners, the exclusive authority to rent the Hotel Condominium Units.

61.     This authority was then given by FSM to Four Seasons, as FSM's agent.

62.     FSM and Terremark, as principals, are liable for the acts of their agent, the Four Seasons.

63.     Four Seasons and FSM (and with respect to GLK and Organek, Terremark and FSM) had specific obligations under the RPA, including:

(a)     To "use reasonable commercial efforts to. . . establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residences [Condominium] Units in the Rental Program," ¶ 3.2(a) of the RPA;

(b)     To "use reasonable commercial efforts to provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence [Condominium] Units in the Rental Program, all in a reasonable manner as determined by FS," ¶ 3.2(b) of the RPA;

(c)     To set the Daily Rental Rate "based on a variety of factors, including through negotiations with a prospective Lodger, with consideration to be given to competition, location, time of year, length of stay, exchange rates and the number of Persons occupying the Subject Unit," ¶ 4.1(b) of the RPA; and

(d)     To "direct[] to the Hotel any reservation inquiries received by the FS Central reservation system relating to the Hotel Residence Units or pursing similar lodging product in the competitive Miami market. . . .," ¶ 3.2(c) of the RPA.

### D.     Defendants Owed Plaintiffs Fiduciary Duties

64.     As set forth above, Defendants created, marketed and sold to Plaintiffs' Hotel Condominium Units and an associated rental program that required Plaintiffs to trust Defendants

with the exclusive authority to rent, market and manage Plaintiffs' Hotel Condominium Units, including the power to control the rental income derived there from.

65.     Indeed, the entire structure of the parties' on-going business relationship contemplated Defendants' possessing all of the power vis-à-vis Defendants, and Plaintiffs trusted Defendants to use their tremendous power over their property, affairs and business in a fair, honest and ethical way.

66.     As a consequence of the foregoing, Defendants owed Plaintiffs fiduciary duties including the duty of loyalty and utmost good faith; the duty of candor; the duty to refrain from self-dealing; the duty to act with the integrity of the strictest kind; the duty of fair and honest dealing; the duty of full disclosure; the duty to use the level of skill and prudence that an ordinary, capable and careful person would use in handling his own affairs; the duty to disclose all facts to the Plaintiffs that might affect their rights; and the duty to account to Plaintiffs for all transactions affecting them.

67.     The tremendous need for Defendants' to avoid self dealing and to act with the integrity of the strictest kind is underscored here by the reality that the Hotel Units and the Hotel Condominium Units both target lodgers as their customers.

68.     Notwithstanding Defendants' fiduciary duty to refrain from self dealing, Defendants inserted a tie breaking mechanism into the RPA's which states "rental of rooms in the Hotel shall be afforded priority over rental of units in the Rental Program." ¶ 3.2(a)(D) of the RPA.

69.     Plaintiffs understood that this meant that if a prospective lodger had absolutely no preference as to whether he or she stayed in a Hotel Unit or Hotel Condominium Unit that the Defendants would break the tie by directing the lodger to the Hotel.  Indeed, the Four Seasons

corporate representative verified under oath that this is in fact the meaning the Four Seasons attributes to this provision.

70.     Plaintiffs always contemplated, however, that the Defendants would create a level playing field on which the Hotel Units and Hotel Condominium Units would compete on a fair and honest basis.

71.     Plaintiffs accepted the possibility of competition because they believed that the vast majority of lodgers would have a preference for either a Hotel Unit or a Hotel Condominium Unit, and that if both types of units were priced at market rates and marketed similarly, personal preferences and the laws of economics would allow them to attract a significant number of lodgers.

72.     Under no circumstances, however, did Plaintiffs ever envision or consent to Defendants titling the playing field in favor of renting the Hotel Units.

73.     Nevertheless, as described below, through what can only be described as a systematic campaign of predatory pricing practices and willful failure to properly market the Hotel Condominium Units, Defendants have titled to playing field in favor of renting the Hotel Units to the exclusion and at the expense of renting the Hotel Condominium Units.

74.     Defendants' actions were motivated by an express intent to benefit themselves at the Hotel Condominium Units' expense.

75.     Having engaged in these practices, by and through the acts alleged herein, Defendants have breached their fiduciary duties and caused Plaintiffs substantial damages.

**D.     Defendants Breached Their Contractual and Fiduciary Duties**

a.     Preference to the Unsold Terremark Units

76.     Terremark still owns approximately seventeen (17) units in the Condominium

17

Hotel and has been actively trying to sell them (the "Unsold Terremark Units").

77.     Prior to purchasing their Units and again after entering into the RPA, the Plaintiffs were told by Julian Leon-Velarde and Edgar Gutierrez that the Unsold Terremark Units would not be included in the Rental Program.

78.     This promise was never kept with respect to the one bedroom Unsold Terremark Units, and was only kept for a limited amount of time with respect to the two-bedroom Unsold Terremark Units.  Had the unsold Terremark Units been excluded from the rental program, as promised, then Plaintiff Hotel Condominium Units would have been rented more frequently.

79.     Defendants breached ¶ 3.2(a) of the RPA which requires them to "establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residences [Condominium] Units" by failing to establish such practices and by giving priority to Terremark's unsold Hotel Condominium Units.  Indeed, all of the Defendants have acted jointly to ensure that the Unsold Terremark Units are rented with a higher priority and preference than Plaintiffs' Units.

80.     The Plaintiffs have attempted to send lodgers to their units in the Four Seasons, but the Four Seasons has done everything it can to interfere with the Plaintiffs' abilities to put lodgers in their units.  For example, while the Four Seasons routinely places lodgers in Plaintiffs' Units for less than $200.00 per night, the Four Seasons refused to allow Mr. Organek to place a lodger who was willing to pay $350.00 per night for an entire month, thus depriving Mr. Organek of several thousand dollars in revenue.  In another instance, the Four Seasons did not place a lodger secured by Mr. Organek in one of Mr. Organek's Units as it was required to do, and diverted the business elsewhere.

81.     As a result, the Four Seasons and FSM have failed act in good faith and have

failed to "establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program."

82.     Moreover, the Four Seasons has done everything it can to prevent Mr. Organek and GLK from advertising their units on a web site they created, and has even threatened them with legal action when they attempted to do so.

     b.     Failure to Establish Daily Rental Rates

83.     As set forth above, ¶ 4.1(b) of the RPA provides that the Daily Rental Rate will be established based on a variety of factors, including the time of year.

84.     In breach of this provision, the same rates were being charged in low season as were being charged during high season.

85.     Moreover, by charging *i.e.,* $400.00 for one room in the Four Seasons Hotel Miami, and $2,000.00 for one of the Plaintiffs' two bedroom, two bathroom Units, it does not make financial sense for a prospective lodger to rent one of the Plaintiffs' Units.  For example, two adults and two children could rent two adjoining rooms for $800.00, or pay $2,000.00 for a two bedroom, two bathroom Condominium Hotel Unit.[3]

86.     In fact, the Four Seasons General Manager admits it prices the Condominium Hotel Units higher than comparable Hotel Units so as to prevent the Condominium Hotel Units from having an "unfair advantage."

87.     The two bedroom suites in the Hotel are also priced at much lower rates than the two bedroom units in the Hotel Condominium, such that it does not make financial sense for a lodger to rent one of the Plaintiffs' Units.

---

[3]     Meanwhile, when convenient for the Four Seasons, it will place lodgers in Plaintiffs Units for less than $200.00 per night.

88.     The Four Seasons and FSM engaged in deliberately predatory pricing activities so as to preclude rental of the Plaintiffs' Hotel Condominium Units.

89.     The Plaintiffs asked the Four Seasons to reduce the prices of their Units, and only in mid-2008 has the Four Seasons ostensibly agreed to provide a seasonal rate structure, as required under the RPA.   However, as admitted by the Four Seasons' General Manager, the actual rates being charged for the Condominium Hotel Units are not published, thus the seasonal rate structure provides no benefit in terms of the ability to rent the Units.

90.     Four Seasons and FSM refuse to remedy the damages caused by years of failing to abide by ¶ 4.1(b), and the Four Seasons and FSM refuse to provide information regarding whether the new seasonal rate structure is competitive with the rates being charged for Hotel Units.

c.      Failure to Use Reasonable Commercial Efforts to Provide Marketing, Sales and Advertising services

91.     The Four Seasons has failed to use reasonable commercial efforts to provide marketing, sales and advertising services in violation of ¶ 3.2 of the RPA.

92.     By way of example, the Condominium Hotel Units are nearly impossible to find on the Hotel's website and there is no pricing information available.

93.     Moreover, pursuant to ¶ 3.2(c) of the RPA, "reservation inquiries received by the FS central reservation system relating to the Hotel Residence Units or pursuing similar lodging product in the competitive Miami market will be directed to the Hotel."   This provision of the RPA is regularly breached.

94.     When prospective lodgers call the Four Seasons, the representatives often deny the existence of the Condominium Hotel Units, even if specifically asked.

95.     Moreover, the Four Seasons often does not acknowledge the existence of the

kitchen units even when prospective lodgers call to request such a unit. In fact, within weeks of the filing of this action, persons calling as prospective lodgers were told that units with kitchens were only available if the prospective lodger was going to rent a unit for a month or longer.

96.     The Four Seasons representatives have also ignored specific requests from prospective lodgers whose request criteria would mandate rental of the Plaintiffs' Unit. The representatives ignore the specific request, and then try to "steer" the prospective lodgers into renting one of the Unsold Terremark Units or a Hotel Unit.

97.     When the Four Seasons does direct the prospective lodger to the Hotel Condominium, the Hotel reservation desk has referred prospective lodgers to the "sales department," and gives the prospective lodger another number to call.

98.     Logistically, a prospective lodger will not want to call three phone numbers to make a reservation, rendering this yet another bad faith and predatory practice.

99.     On one occasion, the phone in the sales department rang eighteen times before the caller hung up.

100.    On another occasion, when the prospective lodger called the Four Seasons in Miami directly, the caller was promised a return phone call, which took more than three hours to receive.

101.    Furthermore, Four Seasons often only puts guests in the Hotel Condominium Units when it cannot accommodate guests in their own Hotel rooms (even if a unit with a kitchen is requested) and the Unsold Terremark Units.

102.    Four Seasons breached its obligation to use commercially reasonable efforts under ¶ 3.2(b) of the RPA by not:

        (a)     Allowing prospective lodgers access to view the availability of the Hotel

Condominium Units on the Hotel's website;

(b)    Allowing prospective lodgers access to view the prices of the Hotel Condominium Units on the Hotel's website;

(c)    Allowing prospective lodgers to receive information about the existence of the Hotel Condominium Units, including but not limited to, informing them of the existence and availability of the Hotel Condominium Units when they call the Hotel's reservation system;

(d)    Allowing prospective lodgers to access information and make reservations for the Hotel Condominium Units through ordinary and commercially reasonable methods, including participation and/or inclusion in the industry accepted e-commerce channels such as, without limitation, Expedia.com, Travelocity.com and Hotels.com;

(e)    Pricing the Hotel Condominium Units for rental at commercially competitive rates that are timely adjusted to account for the promised ordinary and commercially accepted factors such as the availability of similar units from competitors, the time of year, the length of stay and overall demand (basic revenue management); and

(f)    Refraining from taking from such other actions which discourage prospective lodgers from renting the Hotel Condominium Units due to unfair pricing and steering prospective lodgers from the Hotel Condominium Units.

d.    <u>Failing to Report and Pay Plaintiffs revenue earned</u>

103.    Paragraph 4.1(d) of the RPA provides that Plaintiffs shall receive eighty percent (80%) of the Adjusted Income generated by the Units. Due to the wrongful conduct and theft by FSM and Four Seasons, the Plaintiffs' funds have been withheld and misrepresented.

104. By way of example only, Carenza, as director of Glendaris, informed the Four Seasons that it had a prospective guest to rent Hotel Condominium Unit #3506 as "Friends and Family" from August 2, 2008 through August 22, 2008.

105. The Four Seasons, through Miriett Ferreiro represented that the Unit would be occupied from late July through July 31, but the guest would like to extend through August 9, 2008.

106. The extension, according to Ms. Ferreiro, was then confirmed by the guest.

107. Mr. Carenza and his family were using their own unit during this period and one afternoon towards the end of July, his children mistakenly rang the doorbell of Hotel Condominium Unit #3506, which is directly above his own unit. When an unknown man opened the door to Unit #3506, the children realized that they had the wrong floor and told Mr. Carenza what happened.

108. However, the Four Seasons reported that Unit #3506 had no income for July 2008 and August 2008.

109. The Four Seasons did not remit the proceeds to Glendaris, and until a few months after Glendaris filed this law suit referencing this theft, the nearly $8,000.00 in rental income was not properly reported and paid to Glendaris.

110. The Four Seasons is one of the leading hotel groups in the world, and the level of failures and incompetence by this industry leader have been so egregious so as to demonstrate its malice and deliberate misconduct with respect to the implementation of the RPA.

111. All conditions precedent to bringing this action have been performed, have occurred, or have otherwise been waived.

112. Plaintiffs have retained the undersigned legal counsel and are obligated to pay

23

said counsel reasonable attorneys' fees and costs.

113.   Pursuant to the RPA and the Florida Statutes set forth below, Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

**COUNT I**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES**
**ACT AGAINST MILLENNIUM, TERREMARK AND FSM**

114.   The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

115.   Through this Count, Carenza Piredda and Glendaris sue Defendants Millennium, Terremark and FSM for unfair and deceptive trade practices in violation of § 501.204, Fla. Stat.

116.   In violation of § 501.204, Fla. Stat., as set forth above, Millennium FSM and Terremark engaged in deceptive and unfair trade practices by inducing Plaintiffs into purchasing Hotel Condominium Units under false pretenses.

117.   The false and misleading information provided to Plaintiffs was in response to direct inquiries from said Plaintiffs, and Defendants deliberately omitted material facts despite Plaintiffs' direct inquires.

118.   In violation of § 501.204, Fla. Stat., as set forth above, Millennium, FSM and Terremark engaged in deceptive and unfair trade practices by implementing the Rental Purchase Agreements in such as way as to give the Hotel Units a grossly unfair advantage vis-à-vis the Hotel Condominium Units and by giving preferential treatment to the Hotel Condominium Units owned by Terremark.

119.   As a result of Defendants' deceptive and unfair practices, Plaintiffs' Hotel Condominium Units do not generate nearly as much income as they otherwise would.

24

Consequently, Plaintiffs' Hotel Condominium Units are worth substantially less than they paid for them.

120.   As a result of Defendants' deceptive and unfair practices, Plaintiffs have suffered substantial actual damages and incurred legal expenses including costs and attorneys' fees..

**WHEREFORE**, Plaintiffs, Pietro Carenza, Gianluca Piredda and Glendaris, LLC, demand judgment for:

(A)   Their actual damages, pursuant to Fla. Stat. § 501.211;

(B)   Their attorneys' fees and costs, pursuant to Fla. Stat. § 501.2105;

(C)   Prejudgment interest; and

(D)   All such other and further relief as this Court deems just and proper.

## COUNT II
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AGAINST MILLENNIUM, TERREMARK AND FSM

121.   The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

122.   Through this count, GLK and Organek sue Millennium, Terremark and FSM for unfair and deceptive trade practices in violation of § 501.204, Fla. Stat.

123.   In violation of § 501.204, Fla. Stat., as set forth above, Millennium FSM and Terremark engaged in deceptive and unfair trade practices by inducing Plaintiffs into purchasing their Hotel Condominium Units under false pretenses.

124.   The false and misleading information provided to Plaintiffs was in response to direct inquiries from said Plaintiffs, and Defendants deliberately omitted material facts despite Plaintiffs' direct inquires.

125.   In violation of § 501.204, Fla. Stat., as set forth above, Millennium, FSM and

Terremark engaged in deceptive and unfair trade practices by implementing the Rental Purchase Agreements in such as way as to give the Hotel Units a grossly unfair advantage vis-à-vis the Hotel Condominium Units and by giving preferential treatment to the Hotel Condominium Units owned by Terremark.

126.    As a result of Defendants' deceptive and unfair practices, Plaintiffs' Hotel Condominium Units do not generate nearly as much income as they otherwise would. Consequently, Plaintiffs Hotel Condominium Units are worth substantially less than they paid for them.

127.    As a result of Defendants' deceptive and unfair trade practices, Plaintiffs have suffered substantial actual damages and incurred legal expenses including costs and attorneys' fees.

**WHEREFORE**, Plaintiffs, Emanuel Organek, and GLK, L.P. demand judgment for:

(A)    Their actual damages, pursuant to Fla. Stat. § 501.211;

(B)    Their attorneys' fees and costs, pursuant to Fla. Stat. § 501.2105;

(C)    Prejudgment interest; and

(D)    All such other and further relief as this Court deems just and proper.

**COUNT III**
**MISLEADING ADVERTISING – Violation of Fla. Stat. § 817.41**

128.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if they were forth fully herein.

129.    Through this Count, Carenza, Baron, Glendaris and Piredda sue Defendants Millennium, Terremark and FSM for misleading advertising in violation of Fla. Stat. § 817.41.

130.    In violation of Fla. Stat. § 817.41, Defendants, in connection with the sale of the Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith,

26

provided material "misleading advertising" to Plaintiffs including statements made or disseminated to Plaintiffs in oral, written or other form concerning the marketing and other ancillary services that Defendants and their affiliate Four Seasons would provide to Plaintiff in association with the rental and maintenance of Hotel Condominium Units.

131.   Defendants knew or through the exercise of reasonable care, could have been ascertained, that their advertisements were untrue or misleading.

132.   Defendants disseminated misleading advertisements to Plaintiffs with the intent or purpose of selling Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith, or to induce Plaintiffs to enter into an obligation relating to such Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

133.   Plaintiffs relied on Defendants' false or misleading advertising insofar as Defendants' misleading advertising was outcome determinative for Plaintiffs during their decision making process concerning whether or not to purchase Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

134.   Defendants knew that the level of marketing and other ancillary services that Defendants and their affiliate Four Seasons intended to provide to Plaintiffs in association with the rental and maintenance of Hotel Condominium Units would prevent Plaintiffs from purchasing the Hotel Condominium Units, and intentionally and purposefully withheld material information from Plaintiffs until after the sale of the Hotel Condominium Units.

135.   The misleading advertisements provided to Plaintiffs were in response to direct inquiries from said Plaintiffs, and Defendants deliberately omitted material facts despite Plaintiffs' direct inquires.

136.   By relying on Defendants' misleading advertisements, Plaintiffs have suffered

damages proximately caused by Defendants' misleading advertisements, including a substantial diminution of value of their Hotel Condominium Units and the loss of anticipated rental income.

137.    Fla. Stat. § 817.41 provides for a prevailing Plaintiff to recover their attorneys' fees and costs.

**WHEREFORE**, Plaintiffs, Pietro Carenza, Nancy Baron, Gianluca Piredda and Glendaris, LLC demand judgment against FSM Hotel, LLC Terremark Brickell, II, Ltd. and Millennium Partners, LLC for:

(A)    An award of damages including special damages, lost profits, consequential damages and compensatory damages;

(B)    Their attorneys' fees and costs pursuant to Fla. Stat. § 817.41;

(C)    Prejudgment interest; and

(D)    All such other and further relief as this Court deems just and proper.

**COUNT IV**
**MISLEADING ADVERTISING – Violation of Fla. Stat. § 817.41**

138.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully forth herein.

139.    Through this Count, GLK, L.P. and Emanuel Organek sue Defendants Millennium, Terremark and FSM for misleading advertising in violation of Fla. Stat. § 817.41.

140.    In violation of Fla. Stat. § 817.41, Defendants in connection with the sale of the Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith, provided material "misleading advertising" to Plaintiffs including statements made or disseminated to Plaintiffs in oral, written or other form concerning the marketing and other ancillary services that Defendants and their affiliate Four Seasons would provide to Plaintiffs in association with the rental and maintenance of Hotel Condominium Units.

28

141.    Defendants knew or through the exercise of reasonable care, could have been ascertained, that their advertisements were untrue or misleading.

142.    Defendants disseminated misleading advertisements to Plaintiffs with the intent or purpose of selling Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith, or to induce Plaintiffs to enter into an obligation relating to such Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

143.    Plaintiffs relied on Defendants' false or misleading advertising insofar as Defendants' misleading advertising was outcome determinative for Plaintiffs during their decision making process concerning whether or not to purchase Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

144.    Defendants knew that the level of marketing and other ancillary services that Defendants and their affiliate Four Seasons intended to provide to Plaintiffs in association with the rental and maintenance of Hotel Condominium Units would prevent Plaintiffs from purchasing the Hotel Condominium Units, and intentionally and purposefully withheld material information from Plaintiffs until after the sale of the Hotel Condominium Units.

145.    The misleading advertisements provided to Plaintiffs were in response to direct inquiries from said Plaintiffs, and Defendants deliberately omitted material facts despite Plaintiffs' direct inquires.

146.    By relying on Defendants' misleading advertisements, Plaintiffs have suffered damages proximately caused by Defendants' misleading advertisements, including a substantial diminution of value of their Hotel Condominium Units and the loss of anticipated rental income.

147.    Fla. Stat. § 817.41 provides for a prevailing Plaintiff to recover their attorneys' fees and costs.

**WHEREFORE**, Plaintiffs, Emanuel Organek and GLK. L.P. demand judgment against FSM Hotel, LLC Terremark Brickell, II, Ltd. and Millennium Partners, LLC for:

(A)　An award of damages including special damages, lost profits, consequential damages and compensatory damages;

(B)　Their attorneys' fees and costs pursuant to Fla. Stat. § 817.41;

(C)　Prejudgment interest; and

(D)　All such other and further relief as this Court deems just and proper.

## COUNT V
## FRAUDULENT INDUCEMENT

148.　The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

149.　Through this Count, Plaintiffs, Pietro Carenza, Nancy Baron, Glendaris, LLC, and Gianluca Piredda sue Defendants Millennium, FSM and Terremark for fraudulently inducing them into purchasing Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

150.　Defendants deliberately made fraudulent misrepresentations of material facts and intentionally omitted to tell Plaintiffs other material facts with the intention of inducing Plaintiffs into acquiring Hotel Condominium Units and the furniture, fixtures and equipment associated therewith.

151.　Defendants knew or should have known of their representations were false and that the omitted facts were material and should have been disclosed.

152.　Plaintiffs relied on Defendants' fraudulent misrepresentations of fact and their belief that all material facts had been disclosed insofar as this material information and belief were outcome determinative for Plaintiffs during their decision making process concerning

whether or not to purchase Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

153.    The misrepresentations and omissions were made by Defendants' agents Julian Leon Velarde, Analisa Arcacha and Linda McKenzie, and through Exhibits 1 and 2, all in direct response to inquiries made by Plaintiffs.

154.    But for the misrepresentations and omissions of material fact, Plaintiffs would not have purchased the Hotel Condominium Units.

155.    Plaintiffs have suffered damages as a result of the fraudulent misrepresentations and omissions.

**WHEREFORE**, Plaintiffs, Pietro Carenza, Nancy Baron, Gianluca Piredda and Glendaris, LLC demand judgment against FSM Hotel, LLC, Terremark Brickell, II, Ltd. and Millennium Partners, LLC for:

(A)    An equitable rescission of their purchase contracts;

(B)    An accounting and return of all monies that Plaintiffs have expended for and in association with their Hotel Condominum Units;

(C)    An award of damages including special damages, lost profits, consequential damages and compensatory damages;

(D)    Attorneys' fees and costs pursuant to the RPA;

(E)    Prejudgment interest, and

(F)    All such other and further relief as this Court deems just and proper.

## COUNT VI
## FRAUDULENT INDUCEMENT

156.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

31

157.     Through this Count, Plaintiffs, Emanuel Organek and GLK, L.P. sue Defendants Millennium, FSM and Terremark for fraudulently inducing them into purchasing Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

158.     Defendants deliberately made fraudulent misrepresentations of material facts and intentionally omitted to tell Plaintiffs other material facts with the intention of inducing Plaintiffs into acquiring Hotel Condominium Units and the furniture, fixtures and equipment associated therewith.

159.     Defendants knew or should have known of their representations were false and that the omitted facts were material and should have been disclosed.

160.     Plaintiffs relied on Defendants' fraudulent misrepresentations of fact and their belief that all material facts had been disclosed insofar as this material information and belief were outcome determinative for Plaintiffs during their decision making process concerning whether or not to purchase Hotel Condominium Units, and the furniture, fixtures and equipment associated therewith.

161.     But for the misrepresentations and omissions of material fact, Plaintiffs would not have purchased the Hotel Condominium Units.

162.     Plaintiffs have suffered damages as a result of the fraudulent misrepresentations and omissions.

**WHEREFORE**, Plaintiffs, Emanuel Organek and GLK, L.P. demand judgment against FSM Hotel, LLC, Terremark Brickell, II, Ltd. and Millennium Partners, LLC for:

(A)     An equitable rescission of their purchase contracts;

(B)     An accounting and return of all monies that Plaintiffs have expended for and in association with their Hotel Condominum Units;

(C)     An award of damages including special damages, lost profits, consequential damages and compensatory damages;

(D)     Attorneys' fees and costs pursuant to the RPA;

(E)     Prejudgment interest, and

(F)     All such other and further relief as this Court deems just and proper.

## COUNT VII
## BREACH OF CONTRACT
## AGAINST FSM HOTEL, LLC, FOUR SEASONS AND TERREMARK

163.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

164.    Through this Count, Carenza, Piredda and Glendaris sue Defendants FSM and Four Seasons for breaching the RPA.

165.    The Four Seasons and FSM have specifically breached the contract by failing to "establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program."

166.    Moreover, paragraph 4.1(b) of the RPA provides that the Daily Rental Rate will be established based on a variety of factors, including the time of year, however, the Four Seasons failed to establish Daily Rental Rates which comply with the requirements of this provision.

167.    Four Seasons and FSM have failed to comply with this obligation and the pricing policy has precluded the Plaintiffs from standing a reasonable chance of having their Units rented.  This constitutes a breach of the RPA which has caused damages to the Plaintiffs, including the loss of profits from the loss and/or lack of rental income that should have been realized from the Units.  Plaintiffs' lost profits were foreseeable and actually caused by FSM and

33

Four Seasons' failure to comply with the obligations under ¶ 4.1(b) of the RPA. These damages actually and proximately flow from the breaches. However, to the extent that these damages actually, but not necessarily flow from these breaches, they are special damages that have been specifically pled.

168.   The RPA provides in ¶ 3.2(b) that the Hotel "shall use reasonable commercial efforts to provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence Units in the Rental Program, all in a reasonable manner as determined by FS."

169.   ¶ 3.2 of the RPA is being breached, as more fully set forth above and incorporated herein.

170.   Moreover, the Four Seasons has misrepresented the availability of Plaintiffs' Units and has failed to remit proceeds in breach of the RPA.

171.   FSM is liable for the acts of its agent, the Four Seasons, and is also liable as a party to the RPA and/or as owner of the Hotel.

172.   As a result of the Four Seasons and FSM's breaches of contract, the Plaintiffs have been damaged, including the loss of profits from the loss and/or lack of rental income that should have been realized from the Hotel Condominium Units. In addition, as a result of the actions complained of, the Hotel Condominium Units are neither as marketable nor worth as much money as they otherwise would be worth but for the breaches. The possibility of reselling the Hotel Condominium Units was specifically contemplated by all parties at the time of the sale.

173.   Plaintiffs' lost profits, the lack of marketability and diminution in value were foreseeable and actually caused by FSM and Four Seasons' breaches of contract. These damages actually and proximately flow from the breaches of contract. However, to the extent that these

damages actually, but not necessarily flow from these breaches of contract, they are special damages that have been specifically pled.

174.    The acts of the Four Seasons were deliberate, committed in bad faith or the result of gross negligence.  Moreover, the wrongful and illegal acts of the Four Seasons were done deliberately to further the interests of the Four Seasons as well as FSM and Terremark.

**WHEREFORE,** Plaintiffs, Pietro Carenza, Gianluca Piredda and Glendaris, LLC demand judgment against Four Seasons Hotel Limited and FSM Hotel, LLC for:

(A)    An award of damages, including special damages, lost profits, consequential damages and compensatory damages;

(B)    Attorneys' fees and costs pursuant to the RPA;

(C)    Prejudgment interest; and

(D)    All such other and further relief as this Court deems just and proper.

## COUNT VIII
## BREACH OF CONTRACT
## AGAINST FSM HOTEL, LLC, FOUR SEASONS AND TERREMARK

175.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

176.    Through this Count GLK and Organek sue Defendants FSM Hotel, Four Seasons and Terremark for breaching the RPA.

177.    The Four Seasons, Terremark and FSM have breached the contract by failing to "establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program."

178.    Moreover, paragraph 4.1(b) of the RPA provides that the Daily Rental Rate will be established based on a variety of factors, including the time of year, however, the Four

35

Seasons failed to establish Daily Rental Rates which comply with the requirements of this provision.

179.    Four Seasons, Terremark and FSM have failed to comply with this obligation and the pricing policy has precluded GLK and Organek from standing a reasonable chance of having their Units rented.  This constitutes a breach of the RPA which has caused damages to GLK and Organek, including the loss of profits from the loss and/or lack of rental income that should have been realized from the Units.  GLK and Organek's lost profits were foreseeable and actually caused by Four Seasons, Terremark and FSM's failure to comply with the obligations under ¶ 4.1(b) of the RPA.  These damages actually and proximately flow from the breaches.  However, to the extent that these damages actually, but not necessarily flow from these breaches, they are special damages that have been specifically pled.

180.    The RPA provides in ¶ 3.2(b) that the Hotel "shall use reasonable commercial efforts to provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence Units in the Rental Program, all in a reasonable manner as determined by FS."

181.    Paragraph 3.2 of the RPA is being breached, as more fully set forth above and incorporated herein.

182.    Moreover, the Four Seasons has misrepresented the availability of GLK and Organek's Hotel Condominium Units and has failed to remit proceeds in breach of the RPA.

183.    FSM and Terremark are liable for the acts of their agent, the Four Seasons, and are also liable as a party to the RPA and/or as owner of the Hotel.

184.    The acts of the Four Seasons were deliberate, committed in bad faith or the result of gross negligence.  Moreover, the wrongful and illegal acts of the Four Seasons were done

deliberately to further the interests of the Four Seasons as well as FSM and Terremark.

185.    As a result of the Four Seasons, Terremark's and FSM's breaches, GLK and Organek have been damaged, including the loss of profits from the loss and/or lack of rental income that should have been realized from the Hotel Condominium Units.  In addition, as a result of the actions complained of, the Hotel Condominium Units are neither as marketable nor worth as much money as they otherwise would be worth but for the breaches.  The possibility of reselling the Hotel Condominium Units was specifically contemplated by all parties at the time of the sale.

186.    Plaintiffs' lost profits, the lack of marketability and diminution in value were foreseeable and actually caused by FSM, Terremark and Four Seasons' breaches of contract. These damages actually and proximately flow from the breaches of contract.  However, to the extent that these damages actually, but not necessarily flow from these breaches of contract, they are special damages that have been specifically pled.

**WHEREFORE,** Plaintiffs, Emanuel Organek and GLK, L.P. demand judgment against Four Seasons Hotel Limited, Terremark Brickell II, Ltd. and FSM Hotel, LLC for:

(A)    An award of damages, including special damages, lost profits, consequential damages and compensatory damages;

(B)    Attorneys' fees and costs pursuant to the RPA;

(C)    Prejudgment interest; and

(D)    All such other and further relief as this Court deems just and proper.

## COUNT IX
## VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
## AGAINST FSM HOTEL LLC AND FOUR SEASONS

187.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if

fully set forth herein.

188.    Through this Court, Carenza, Glendaris and Piredda sue Defendants FSM and Four Seasons for breaching the implied covenant of good faith and fair dealing.

189.    Implicit in every contract, here the RPA, is a covenant of good faith and fair dealing.

190.    While ¶ 3.2(a)(D) provides that "rental of rooms in the Hotel shall be afforded priority over rental of units in the Rental Program," the RPA does not contemplate that the Unsold Terremark Units would be afforded priority over the Plaintiffs' Units.

191.    Acting willfully, in bad faith and violating the implied covenant of good faith and fair dealing, FSM and Four Season have given priority to the Unsold Terremark Units and have tried to steer potential lodgers into renting the Unsold Terremark Units even when only the Plaintiffs' Units fit the requested criteria provided by the prospective lodger.

192.    The RPA provides in ¶ 3.2(b) that the hotel "shall use reasonable commercial efforts to provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence Units in the Rental Program, all in a reasonable manner as determined by FS."

193.    Nonetheless, FSM and Four Seasons have acted with malice and in bad faith with respect to carrying out its duties under ¶ 3.2.  For example, the Units have been nearly impossible to find on the website, which constitutes a breach of the implied covenant of good faith and fair dealing.

194.    The advertising and sales efforts have been deliberately designed to be wholly inadequate and ineffectual, and the Four Seasons has admitted the failures of the program in connection with the proposal for a new program in May 2008.

195.    Moreover, the Four Seasons has acted in bad faith in connection with its duties under the RPA because it has, *inter alia,* (i) denied the existence of the Plaintiffs' Units as available Units for rent; (ii) indicated that kitchen units are only available for rental for periods of a month or longer; (iii) taken three hours to return calls to prospective lodgers; (iv) denied the existence of Units with kitchens; and (v) referred callers to the Hotel, which then refers callers to a "sales department" where the phone rings eighteen times without an answer.

196.    Four Seasons and FSM have breached their obligation to use commercially reasonable efforts under ¶ 3.2(b) of the RPA by not: (a) Allowing prospective lodgers access to view the availability of the Units on the Hotel's website; (b)Allowing prospective lodgers to receive information about the existence of the Hotel Residence Units, including but not limited to, informing them of the existence and availability of the Units when they call the Hotel's reservation system; (c) Allowing prospective lodgers to access information and make reservations for the Units through ordinary and commercially reasonable methods, including participation and/or inclusion in the industry accepted e-commerce channels such as, without limitation, Expedia.com and Hotels.com; (d) Pricing the Units for rental at commercially competitive rates that are timely adjusted to account for ordinary and commercially accepted factors such as the availability of similar units from competitors, the time of year, the length of stay and overall demand (basic revenue management); and (e) Refraining from taking actions which discourage prospective lodgers from renting the Condominium Hotel Units due to unfair pricing and steering prospective lodgers from the Condominium Hotel Units.

197.    The Four Seasons and FSM have violated the covenant of good faith and fair dealing by failing to act in good faith to "establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program."

198. Moreover, the Four Seasons' bad faith pricing policy has precluded the Plaintiffs from standing a reasonable chance of having their Units rented. Because the Four Seasons varies the Hotel room prices on a daily basis, as is customary in the hotel industry, its failure to do so with respect to the Plaintiffs' Units demonstrates the Four Seasons' bad faith and deliberate acts to prevent the Plaintiffs' Units from being rented.

199. The acts of misconduct by the Four Seasons were willful and committed in bad faith. Moreover, the wrongful and illegal acts of the Four Seasons were done to further the interests of the Four Seasons as well as FSM.

200. As a result of the Four Seasons and FSM's violations of the covenant of good faith and fair dealing, the Plaintiffs have been damaged, which damages include the loss of profits from the loss and/or lack of rental income that should have been realized from the Units. In addition, as a result of the actions complained of, the Units are not as marketable as they should be for resale to third parties, an occurrence that was specifically contemplated by all parties at the time of the sale. Moreover, as a result of the actions complained of, Plaintiffs' Units have suffered a drastic diminution in value.

201. Plaintiffs' lost profits, the lack of marketability and diminution in value were foreseeable and actually caused by FSM and Four Seasons' violations of the covenant of good faith and fair dealing. These damages actually and proximately flow from the violations of the covenant of good faith and fair dealing. However, to the extent that these damages actually, but not necessarily flow from these violations of the covenant of good faith and fair dealing, they are special damages that have been specifically pled.

**WHEREFORE**, Plaintiffs, Pietro Carenza, Gianluca Piredda and Glendaris, LLC demand judgment against Four Seasons Hotel Limited and FSM Hotel, LLC for:

(A)     An award of damages, including special damages, lost profits, consequential damages and compensatory damages;

(B)     Attorneys' fees and costs pursuant to the RPA;

(C)     Prejudgment interest; and

(D)     All such other and further relief as this Court deems just and proper.

**COUNT X**
**VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**AGAINST FSM HOTEL LLC, TERREMARK AND FOUR SEASONS**

202.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

203.    Through this Count, Organek and GLK sue FSM, Terremark and Four Seasons for breaching the implied covenant of good faith and fair dealing.

204.    Implicit in every contract, here the RPA, is a covenant of good faith and fair dealing.

205.    While ¶ 3.2(a)(D) provides that "rental of rooms in the Hotel shall be afforded priority over rental of units in the Rental Program," the RPA does not contemplate that the Unsold Terremark Units would be afforded priority over the Plaintiffs' Units.

206.    Acting willfully, in bad faith and violating the implied covenant of good faith and fair dealing, FSM, Terremark and Four Season have given priority to the Unsold Terremark Units and have tried to steer potential lodgers into renting the Unsold Terremark Units even when only the Plaintiffs' Units fit the requested criteria provided by the prospective lodger.

207.    The RPA provides in ¶ 3.2(b) that the hotel "shall use reasonable commercial efforts to provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence Units in the Rental Program, all in a reasonable manner as

41

determined by FS."

208.    Nonetheless, FSM, Terremark and Four Seasons have acted with malice and in bad faith with respect to carrying out its duties under ¶ 3.2. For example, the Units have been nearly impossible to find on the website, which constitutes a breach of the implied covenant of good faith and fair dealing.

209.    The advertising and sales efforts have been deliberately designed to be wholly inadequate and ineffectual, and the Four Seasons has admitted the failures of the program in connection with the proposal for a new program in May 2008.

210.    Moreover, the Four Seasons has acted in bad faith in connection with its duties under the RPA because it has, *inter alia,* (i) denied the existence of the Plaintiffs' Units as available Units for rent; (ii) indicated that kitchen units are only available for rental for periods of a month or longer; (iii) taken three hours to return calls to prospective lodgers; (iv) denied the existence of Units with kitchens; (v) referred callers to the Hotel, which then refers callers to a "sales department" where the phone rings eighteen times without an answer.

211.    Four Seasons, Terremark and FSM have breached their obligation to use commercially reasonable efforts under ¶ 3.2(b) of the RPA by not: (a) Allowing prospective lodgers access to view the availability of the Units on the Hotel's website; (b) Allowing prospective lodgers to receive information about the existence of the Hotel Residence Units, including but not limited to, informing them of the existence and availability of the Units when they call the Hotel's reservation system; (c) Allowing prospective lodgers to access information and make reservations for the Units through ordinary and commercially reasonable methods, including participation and/or inclusion in the industry accepted e-commerce channels such as, without limitation, Expedia.com, Travelocity.com and Hotels.com; (d) Pricing the Units for

rental at commercially competitive rates that are timely adjusted to account for ordinary and commercially accepted factors such as the availability of similar units from competitors, the time of year, the length of stay and overall demand (basic revenue management); and   (e)  Refraining from taking actions which discourage prospective lodgers from renting the Condominium Hotel Units due to unfair pricing and steering prospective lodgers from the Condominium Hotel Units.

212.    The Four Seasons, Terremark and FSM have violated the covenant of good faith and fair dealing by failing to act in good faith to "establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program."

213.    Moreover, the Four Seasons' bad faith pricing policy has precluded the Plaintiffs from standing a reasonable chance of having their Units rented.  Because the Four Seasons varies the Hotel room prices on a daily basis, as is customary in the hotel industry, its failure to do so with respect to the Plaintiffs' Units demonstrates the Four Seasons' bad faith and deliberate acts to prevent the Plaintiffs' Units from being rented.

214.    The acts of misconduct by the Four Seasons were willful and committed in bad faith.  Moreover, the wrongful and illegal acts of the Four Seasons were done to further the interests of the Four Seasons as well as FSM.

215.    As a result of the Four Seasons, Terremark's and FSM's violations of the covenant of good faith and fair dealing, the Plaintiffs have been damaged, including the loss of profits from the loss and/or lack of rental income that should have been realized from the Units. In addition, as a result of the actions complained of, the Units are not as marketable as they should be for resale to third parties, an occurrence that was specifically contemplated by all parties at the time of the sale.  Moreover, as a result of the actions complained of, Plaintiffs' Units have suffered a drastic diminution in value.

43

216.    Plaintiffs' lost profits, the lack of marketability and diminution in value were foreseeable and actually caused by FSM, Terremark and Four Seasons' violations of the covenant of good faith and fair dealing.  These damages actually and proximately flow from the violations of the covenant of good faith and fair dealing.  However, to the extent that these damages actually, but not necessarily flow from these violations of the covenant of good faith and fair dealing, they are special damages that have been specifically pled.

**WHEREFORE**, Plaintiffs, Emanuel Organek and GLK, L.P., demand judgment against Four Seasons Hotel Limited, Terremark Brickell, II, Ltd. and FSM Hotel, LLC for:

(A)    An award of damages, including special damages, lost profits, consequential damages and compensatory damages;

(B)    Attorneys' fees and costs pursuant to the RPA;

(C)    Prejudgment interest; and

(D)    All such other and further relief as this Court deems just and proper.

## COUNT XI
## BREACH OF FIDUCIARY DUTY
## (AGAINST FSM AND FOUR SEASONS)

217.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

218.    Through this Count, Carenza, Glendaris and Piredda sue FSM and Four Seasons for breaching their fiduciary duties.

219.    These Plaintiffs have a high degree of dependency with respect to FSM and Four Seasons.

220.    The Four Seasons and FSM were in a fiduciary position of trust and confidence and were obligated to comport themselves with the duties of care, loyalty and to avoid self-

dealing with respect to these Plaintiffs.

221.   The Four Seasons and FSM undertook to advise, counsel and protect these Plaintiffs' interests with respect to the rental of their Units.

222.   The Four Seasons and FSM had a duty to these Plaintiffs, but breached that duty by acting in their own self interest by: (i) renting the Hotel Units and Unsold Terremark Units even if it meant lying to prospective callers; (ii) making it nearly impossible for prospective lodgers to rent the Plaintiffs' units; (iii) ignoring prospective lodgers' requests to rent Plaintiffs' Units and trying to "steer" them towards renting Unsold Terremark Units; (iv) failing to disclose and denying the existence of available Hotel Residence Units with kitchens to prospective lodgers; (v) misrepresenting to prospective lodgers that kitchen units are only available for rental periods of one month or longer; (vi) failing to establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program; (vii) failing to use reasonable commercial efforts to provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence Units in the Rental Program; (viii) misrepresenting the availability of at least one Plaintiff's Units and failing to remit rental proceeds to the Plaintiff or Plaintiffs; (ix) establishing a policy that the Condominium Hotel Units would be used primarily for "long term rentals," (a term which the General Manager of the Four Seasons Hotel Miami cannot even define) and overflow; (x) failing to establish training for employees or the General Manager specific to the Condominium Hotel or Rental Program Agreement; and (xi) establishing a system by which the Four Seasons personnel would be disincentivized to rent the Condominium Hotel Units as opposed to the Hotel Units.

223.    As a result of the Four Seasons' and FSM's breaches of fiduciary duty, Plaintiffs have been damaged, including the loss of profits from the loss and/or lack of rental income that should have been realized from the Units.  In addition, as a result of the actions complained of, the Units are not as marketable as they should be for resale to third parties, an occurrence that was specifically contemplated by all parties at the time of the sale.  Moreover, as a result of the actions complained of, Plaintiffs' Units have suffered a drastic diminution in value.

224.    Plaintiffs' lost profits, the lack of marketability and diminution in value were foreseeable and actually caused by FSM and Four Seasons' breaches of fiduciary duty.  These damages actually and proximately flow from the violations of the covenant of good faith and fair dealing.  However, to the extent that these damages actually, but not necessarily flow from these breaches of fiduciary duty, they are special damages that have been specifically pled.

**WHEREFORE,** Plaintiffs, Pietro Carenza, Gianluca Piredda and Glendaris, LLC demand judgment against Four Seasons Hotel Limited and FSM Hotel, LLC for:

(A)     An award of damages, including special damages, lost profits, consequential damages and compensatory damages;

(B)     Prejudgment interest; and

(C)     All such other and further relief as this Court deems just and proper.

## COUNT XII
## BREACH OF FIDUCIARY DUTY
## (AGAINST FSM HOTEL, LLC, TERREMARK AND FOUR SEASONS)

225.    The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

226.    Through this Count, Plaintiffs, Emanuel Organek and GLK, L.P. FSM, Terremark and Four Seasons for breaching their fiduciary duties.

46

227.    Plaintiffs have a high degree of dependency with respect to FSM and Four Seasons.

228.    The Four Seasons, Terremark and FSM were in a fiduciary position of trust and confidence and were obligated to comport themselves with the duties of care, loyalty and to avoid self-dealing with respect to the Plaintiffs.

229.    The Four Seasons, Terremark and FSM undertook to advise, counsel and protect the Plaintiffs' interests with respect to the rental of their Units.

230.    The Four Seasons, Terremark and FSM had a duty to the Plaintiffs, but breached that duty by acting in their own self interest by: (i) renting the Hotel Units and Unsold Terremark Units even if it meant lying to prospective callers; (ii) making it nearly impossible for prospective lodgers to rent the Plaintiffs' units; (iii) ignoring prospective lodgers' requests to rent Plaintiffs' Units and trying to "steer" them towards renting Unsold Terremark Units; (iv) failing to disclose and denying the existence of available Hotel Residence Units with kitchens to prospective lodgers; (v) misrepresenting to prospective lodgers that kitchen units are only available for rental periods of one month or longer; (vi) failing to establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program; (vii) failing to use reasonable commercial efforts to provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence Units in the Rental Program; (viii) misrepresenting the availability of at least one Plaintiff's Units and failing to remit rental proceeds to the Plaintiff or Plaintiffs; (ix) establishing a policy that the Condominium Hotel Units would be used primarily for "long term rentals," (a term which the General Manager of the Four Seasons Hotel Miami cannot even define) and overflow; (x) failing to establish training for employees or the General Manager specific to the Condominium Hotel

47

or Rental Program Agreement; and (xi) establishing a system by which the Four Seasons personnel would be disincentivized to rent the Condominium Hotel Units as opposed to the Hotel Units.

231.   As a result of the Four Seasons', Terremark's and FSM's breaches of fiduciary duty, the Plaintiffs have been damaged, including the loss of profits from the loss and/or lack of rental income that should have been realized from the Units.  In addition, as a result of the actions complained of, the Units are not as marketable as they should be for resale to third parties, an occurrence that was specifically contemplated by all parties at the time of the sale. Moreover, as a result of the actions complained of, Plaintiffs' Units have suffered a drastic diminution in value.

232.   Plaintiffs' lost profits, the lack of marketability and diminution in value were foreseeable and actually caused by FSM, Terremark and Four Seasons' breaches of fiduciary duty.  These damages actually and proximately flow from the violations of the covenant of good faith and fair dealing.  However, to the extent that these damages actually, but not necessarily flow from these breaches of fiduciary duty, they are special damages that have been specifically pled.

**WHEREFORE**, Plaintiffs, GLK, L.P. and Emanuel Organek demand judgment against Four Seasons Hotel Limited, Terremark Brickell II, Ltd. and FSM Hotel, LLC for:

(A)    An award of damages, including special damages, lost profits, consequential damages and compensatory damages;

(B)    Prejudgment interest; and

(C)    All such other and further relief as this Court deems just and proper.

## COUNT XIII
## CIVIL CONSPIRACY

48

**(AGAINST TERREMARK, FSM, MILLENNIUM AND FOUR SEASONS)**

233.   The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

234.   Through this Count all of the Plaintiffs sue all of the Defendants for civil conspiracy.

235.   Terremark, FSM, Four Seasons and Millennium have willfully engaged in a scheme of misconduct to sell Hotel Condominium Units under false pretenses and to breach of the RPA and the parties' fiduciary duties to the detriment of the Plaintiff and to the benefit of themselves.

236.   By engaging in the scheme Terremark, FSM, Four Seasons and Millennium have conspired to commit an unlawful act.

237.   Terremark, FSM, Four Seasons and Millennium have engaged in the overt acts in pursuance of the conspiracy, which acts include the following: (i) making false statements of material fact, (ii) intentionally withholding material information from Plaintiffs, (iii) denying the existence of the Plaintiffs' Units as available Units for rent; (iv) indicating that kitchen units are only available for rental for periods of a month or longer; (v) taking three hours to return calls to prospective lodgers; (vi) denying the existence of Units with kitchens; (vii) referring callers to the Hotel, which then refers callers to a "sales department" where the phone rings eighteen times without an answer; (viii) scheming to ensure that the Unsold Terremark Units are more aggressively marketed to prospective lodgers when they call; and (ix) scheming to ensure that the Unsold Terremark Units are rented first, and only then putting any overflow into the Plaintiffs' Units.

238.   As a result of the civil conspiracy and the acts done in furtherance of the conspiracy between Terremark, Four Seasons, FSM and Millennium, the Plaintiffs have been damaged, which damages include the loss of profits from the loss and/or lack of rental income that should have been realized from the Units.  In addition, as a result of the actions complained of, the Units are not as marketable as they should be for resale to third parties, an occurrence that was specifically contemplated by all parties at the time of the sale.  Moreover, as a result of the actions complained of, Plaintiffs' Units have suffered a drastic diminution in value.

239.   Plaintiffs' lost profits, the lack of marketability and diminution in value were foreseeable and actually caused by FSM, Terremark and Four Seasons' violations of the covenant of good faith and fair dealing.  These damages actually and proximately flow from the violations of the covenant of good faith and fair dealing.  However, to the extent that these damages actually, but not necessarily flow from these violations of the covenant of good faith and fair dealing, they are special damages that have been specifically pled.

**WHEREFORE**, Plaintiffs, GLK, L.P., Emanuel Organek, Pietro Carenza, Nancy Baron, Gianluca Piredda and Glendaris, LLC demand judgment against Four Seasons Hotel Limited, FSM Hotel, LLC, Terremark Brickell II, Ltd. and Millennium Partners for:

(A)   An award of damages, including special damages, lost profits, consequential damages and compensatory damages;

(B)   Prejudgment interest; and

(C)   All such other and further relief as this Court deems just and proper.

## COUNT XIV
## DECLARATORY RELIEF

240.   The allegations set forth in paragraphs 1 through 113 are hereby realleged as if fully set forth herein.

50

241.   Through this Count, GLK, Organek, Carenza, Glendaris and Piredda sue all of the Defendants for a declaration of the parties' rights under the RPA.

242.   There is a bona fide, actual, present and practical need for declarations regarding FSM and Four Seasons' duties and obligations under Article III, ¶ 3.2(a)-(c) of the RPA, and the declarations deal with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

243.   Pursuant to Article III, ¶ 3.2(a)-(c) of the RPA, titled "Rental of Subject Unit"; FS [Four Seasons], as agent of Hotel Owner [FSM] pursuant to the Hotel Agreements, shall use reasonable commercial efforts to:

(a)   Rent the Subject Unit to one or more Lodgers for and on behalf of Homeowner,[4] and establish practices designed to achieve an equitable treatment of the Subject Unit with other Hotel Residence Units in the Rental Program provided that Homeowner specifically acknowledges that: ...(D) rental of rooms in the Hotel shall be afforded priority over rental of units in the Rental Program, including the Subject Unit;

(b)   Provide marketing, sales and advertising services to attract Lodgers and to arrange rental of the Hotel Residence Units in the Rental Program, all in a reasonable manner as determined by FS;

(c)   Provide and maintain a reservations system as part of the Hotel's system to process all reservations received from prospective Lodgers for the Hotel Residence Units in the Rental Program.  Reservations will not be accessed through the central reservation system and databases maintained by FS and its Affiliates, but any reservation inquiries received by the FS central reservation system relating to the Hotel Residence Units or pursing similar lodging product in the competitive Miami market will be directed to the Hotel.

---

[4] The RPA defines an owner of a Hotel Residence Unit as a "Homeowner." In this case, Plaintiffs are Homeowners.

244.    Plaintiffs seek a declaration that "priority" under Article III, ¶ 3.2(a)-(c) of the RPA means that: (a) in the event a prospective lodger has absolutely no preference as to whether he or she will stay in a Hotel Unit or Hotel Condominium Unit that the Hotel can place the prospective lodger in a Hotel Unit; (b) the word "priority" does not give the Four Seasons license to engage in predatory pricing tactics or employ strategies or techniques to tilt the playing field on which the parties compete for prospective lodgers in Defendants' favor; (c) setting forth a list of practices which unfairly tilt the playing field on which the parties compete for prospective lodgers in Defendants' favor.

245.    Plaintiffs seek a declaration that the phrase "use reasonable commercial efforts to . . . provide marketing, sales and advertising services" under Article III, ¶ 3.2(a)-(c) of the RPA means that FSM and Four Seasons shall use the same or similar efforts by competitors in the Miami market in the marketing, sales and advertising of the Units, including but not limited to: (a) Allowing prospective lodgers access to view the availability of the Units on the Hotel's website; (b) Allowing prospective lodgers to receive information about the existence of the Hotel Residence Units, including but not limited to, informing them of the existence and availability of the Units when they call the Hotel's reservation system; (c) Allowing prospective lodgers to access information and make reservations for the Units through the ordinary and commercially reasonable methods, including participation and/or inclusion in industry accepted e-commerce channels such as, without limitation, Expedia.com, Travelocity.com and Hotels.com; (d) Pricing the Units for rental at commercially competitive rates that are timely adjusted to account for ordinary and commercially accepted factors such as the availability of similar units from competitors, the time of year, the length of stay and overall demand (basic revenue management); and (e) Refraining from taking from actions which discourage prospective lodgers

from renting the Condominium Hotel Units due to unfair pricing and steering prospective lodgers from the Condominium Hotel Units.

246.    Plaintiffs seek a declaration that ¶ 3.2(c) of the RPA means that FSM and Four Seasons shall provide and maintain a reservation system that is the same or similar to competitors in the Miami market and that reservation inquiries by prospective lodgers that meet the criteria for the Units shall be handled by the Hotel in the same manner as reservation inquiries for Hotel Rooms.

247.    The rights of Plaintiffs under the RPA are dependent upon the facts or the law applicable to the facts related to FSM and Four Seasons' duties and obligations under, *inter alia*, Article III, ¶ 3.2(a)-(c) of the RPA.

248.    The parties have, or reasonably may have, an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law.

249.    The antagonistic and adverse interests of the parties are all before the Court by proper process.

250.    The relief sought by Plaintiffs is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity, but to deal with the rights, duties, and obligations of the parties to this action related to the RPA.'

**WHEREFORE**, Plaintiffs, Pietro Carenza, Glendaris, LLC, Gianluca Piredda GLK, L.P., and Emanuel Organek demand:

(A)    A declaration of the Defendants Four Seasons Hotel Limited and FSM Hotel, LLC's duties and obligations under Article III, ¶ 3.2(a)–(c) of the RPA, as set forth above,

(B)    Their attorneys' fees and costs pursuant to the RPA, and

(C)    All such other and further relief as this Court deems just and proper.

53

Respectfully submitted,

LIPSCOMB, BRADY & EISENBERG, P.L.
Attorneys for Plaintiffs
2 South Biscayne Blvd.
Penthouse 3800
Miami, FL 33131
Telephone: (786) 431-2228
Facsimile:  (786) 431-2229

By: */Deborah B. Baker, Esq./*
      Deborah B. Baker, Esq.
      Fla. Bar No. 294380
      Dbaker@lbefirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this December 21, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: */Deborah B. Baker, Esq./*
      Deborah B. Baker, Esq.

**Four Seasons Miami Rental Program**

**Funds & Cost Responsibility Outline**

**Collected Gross Income**
**(Per Unit)**

↓

Less:
Access Charge (Per Condo Declaration)
Travel Agent/Wholesaler/Realtor Commissions
FF&B Reserve Deposits
Lodging Taxes

↓

**Adjusted Income**

↙                          ↘

**80%**                     **20%**
**to Owner**                **to Hotel**
↓                           ↓
**Owner Responsibilities:**      **Hotel/Manager Responsibilities:**

Basic Ownership Costs           Direct Rental Program Costs
- Property & Income Taxes        • Sales and Marketing
- Casualty & Liability Insurance (on    • Reservations System
  unit and contents)             • Credit Card Commissions
- Condo Association Assessments  • Accounting and Bookkeeping
                                 • Attributable Employee Costs
↓                                 -- Hiring and training
                                  -- Payroll & benefits
                                  -- Worker's Comp & Insurance
                                 • Other operating expenses

                                 ↓

Program Housekeeping Charges    Hotel Facilities Operations
- Clean-up after Homeowner       • Employee Costs
  Occupancies                    • Inventories and working capital
- Weekly or other periodic       • Operating equipment & supplies
  cleaning during Homeowner      • Capital additions and replacements (non-guest
  Occupancies                      room)
- Annual or other deep cleaning  • Other operating expenses
- Carpet & interior window
  cleaning and floor waxing, as   ↓
  needed

↓                               Management Fee Payable to Four Seasons

Cable Television Service Charge/ Unit Power
consumption

↓

Repairs, Maintenance and Replacement



**Exhibit 1**

# FOUR SEASONS HOTEL RESIDENCES, MIAMI

## SUMMARY OF
## RENTAL PROGRAM AGREEMENT

*[Important Note: Prospective participants in the Rental Program should review the full Rental Program Agreement for a more precise understanding of its terms and conditions. The Rental Program Agreement itself will control if there exists any inconsistency between this summary and the Agreement]*

1. <u>Exclusive Rental Program</u>. Four Seasons Hotels Limited ("Manager"), acting in its capacity as agent for the Hotel Owner, is appointed the exclusive rental agent for the Unit as part of the Hotel-administered Rental Program. Unit Owner ("Owner") may not employ or permit anyone other than Manager to provide rental services for the Unit while the Agreement is in effect. Nor may Owner use or authorize any other person to use or enter the Unit, except during permitted Homeowner Occupancy Periods (as described below). (Section 5.2(a)) All Units participating in the Rental Program will be afforded rental priority on an equitable basis with other units in the Program, subject, however, to a variety of qualifying factors, including the priority afforded Hotel room rental, guest preferences as to size, configuration and location of the rental Unit, the number, frequency or length of Homeowner Occupancy Periods and other similar matters. (Section 3.2(a))

2. <u>Homeowner Occupancy Period</u>. Owner may use the Unit during any pre-designated Homeowner Occupancy Period. Owner must designate Homeowner Occupancy Periods for each year not fewer than 120 days prior to December 31st of the preceding calendar year. (Section 5.1) There are no fixed limits to the number, frequency or length of Homeowner Occupancy Periods (though such matters may adversely affect the rental of the Unit). The designated Owner may not charge any fee or rent for occupancy of the Unit by guests of owner or any other occupant during any Homeowner Occupancy Period during the term of the Agreement. (Section 5.2(b)) Owner may use the Unit outside of pre-designated Homeowner Occupancy Periods only with prior notice to Manager and Manager's approval based on whether such occupancy will conflict with any rental of the Unit.

3. <u>Term</u>. The initial term of the agreement will be two (2) years and will automatically renew for consecutive twenty-four (24) month terms (Section 2.1), unless terminated not later than 150 days prior to the expiration date of the then current term of the Agreement. Additionally, the Agreement shall terminate on the sale or notice to Manager of the sale of the Unit. (Section 6.3)

4. <u>Manager's Services</u>. Manager will be responsible for the management of the Rental Program, including: sales and marketing services; operation of a reservations system; check-in and check-out services; accounting, bookkeeping and reporting activities; hiring, training and supervision of employees engaged in Rental Program activities; provision of Rental Program mandatory housekeeping services (as described below).

5. <u>Rental Income</u>. Owner will receive 80% of the Adjusted Income from the rental of the Unit. Adjusted Income is equal to the monies collected for the rental of the unit, minus (A) the current daily access charge assessed under the Condo Hotel Declaration, (B) travel agent and wholesaler commissions, if any, charged in connection with the guest's stay; (C) deposits into the FF&E Reserve (as described below) and (D) any lodging taxes payable to governmental

<u>Exhibit 2</u>

authorities based on such rental. (Section 4.1) There is no pooling of income with other Units in the program. Manager and the Hotel Owner will retain 20% of the Adjusted Income. Manager and Hotel Owner also will receive all non-rental income generated from the guest's stay in the Unit, including, for example, income from food and beverage services, laundry and dry cleaning and similar pay-for-use Hotel services.

6. <u>FF&E/FF&E Reserve</u>. Owner, at its sole cost and expense, must furnish and equip the Unit with a package of furnishing, fixtures and equipment ("FF&E") designated by Manager. Manager may from time to time change the requirements of the designated FF&E package, provided, however, that Owner may terminate the Agreement if unwilling to accept the amended package. (Sections 2.1(c) and 6.3) Manager will deduct from the gross income collected from the rental of the Unit (i.e. before any of the other deductions to reach Adjusted Income) a fixed percentage of such gross income for deposit into a reserve (which may be commingled with other funds managed by the Hotel) to cover replacement of FF&E. The FF&E reserve percentage shall be 1% for calendar year 2003, 2% for calendar year 2004, 3% for calendar year 2005 and 4% for calendar year 2006 and all subsequent years. (Section 5.3(b)). Any funds remaining in the FF&E reserve at the termination of the Agreement will be returned to Owner.

7. <u>Repair, Maintenance & Replacement</u>. Owner is responsible for payment of charges related to the repair, maintenance or replacement of FF&E and the repair and maintenance of the Unit, provided that (A) replacement of FF&E (but not ordinary course repair and maintenance expenses) will be funded first out of the FF&E reserve and (B) Manager will exercise reasonable efforts to secure recovery from guests for any damage caused by the guests. (Section 5.3(a)) If Owner does not effect required repairs, Manager may terminate the Agreement or expend funds in the FF&E reserve for such purposes. In addition, manager has the right to expend up to $500 per repair or replacement without notice to Owner. Owner is also responsible for paying standard charges for housekeeping services required for Rental Program participants, including cleaning after Homeowner Occupancy Periods, weekly or other periodic cleaning during Homeowner Occupancy Periods, annual or other deep cleaning and carpet and interior window cleaning and floor waxing as needed.

8. <u>Insurance</u>. Owner must maintain liability insurance and casualty insurance relating to the Unit's FF&E and other contents as required by Manager from time to time. Owner also must provide Manager with copies of certificates of such insurance and add Manager and Hotel Owner as additional or named insureds as requested.

9. <u>Ownership Expenses</u>. Owner is responsible, at Owner's expense, for payment of all of the normal costs associated with ownership of the Unit, including real and personal property taxes, all utility and insurance charges and all condominium association assessments or similar charges relating to the Unit.

NY 380753 v4

2

AMENDED AND RESTATED GUARANTEE AGREEMENT

THIS AMENDED AND RESTATED GUARANTEE AGREEMENT ("Agreement") is made and entered into this 23rd day of July, 2004, by and between TERREMARK BRICKELL II, LTD., a Florida limited partnership ("Seller") and GLK, L.P., a Washington limited partnership, ("GLK") and Emanuel Organek ("Emanuel") (GLK and Emanuel are hereinafter collectively referred to as the "Buyers" or individually referred to as a "Buyer") ("Purchaser").

WITNESSETH:

WHEREAS, Seller and GLK have entered into those certain Purchase Agreements dated as of May 13, 2004 (the "GLK Purchase Agreements") for the purchase and sale of Units 3005, 3107, 3101 and 3210 (the "GLK Units") in the Millenium Tower Condominium Hotel; and

WHEREAS, Seller and Emanuel have entered in certain Purchase Agreements dated as of May 13, 2004 (the "Emanuel Purchase Agreements") for the purchase and sale of Units 3204, 3307 and 3512 (the "Emanuel Units") in the Millenium Tower Condominium Hotel; and

WHEREAS, Seller has agreed to deposit a portion of the sales price with the "Escrow Agent" (as hereinafter defined) for the purpose of guaranteeing to buyer a certain amount of rental income for the GLK Units and the Emanuel Units (collectively, the "Units").

WHEREAS, This Agreement shall be deemed a complete replacement of that certain Guarantee Agreement by and between Seller and GLK dated May 13, 2004, which is hereby deemed to be null and void. This Amended and Restated Guarantee Agreement shall also amend, modify, restate and supersede that certain Guarantee Agreement dated as of July 19, 2004, which Guarantee Agreement which is hereby deemed to be null and void.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      All defined terms, except as otherwise defined herein, shall have the meaning as set forth in the GLK Purchase Agreements and the Emanuel Purchase Agreements (collectively, the "Purchase Agreements"). The foregoing recitals are true and correct and are incorporated herein as if repeated at length.

2.      At Closing, Seller shall deposit with Mombach, Boyle & Hardin, P.A. ("Escrow Agent") the sum of $718,200.00 (the "Escrow Account"). The Escrow Agent shall pay to the respective Buyer on or before the first day of each month, commencing with the month immediately following the closing date and continuing for a period of 48 months thereafter (the "Escrow Period") the aggregate sum of $100,000.00 reduced by the "Adjustment Amount" (as hereinafter defined) (the "Monthly Guaranty Payment"). Each Monthly Guaranty Payment shall relate to rentals from Units for the previous calendar month and shall be prorated for the first and last months of the term hereof. This Agreement shall terminates upon the earlier to occur of the end of the Escrow Period or at such time as all of the funds in the Escrow Account have been expended. Seller shall have no liability for determining the amounts to be paid to each of the Buyers, but rather the same shall be determined solely by the Buyers. Buyers hereby indemnify Seller against any liability or claims resulting from the allocations of the Escrow Amount among the Buyers.

3.      Buyers shall provide to Escrow Agent a monthly statement (the "Monthly Statement") of the net rental income received from the rental of the Units for the immediate preceding month, prepared on a Cash Basis (the "Net Rental Income"). The "Adjustment Amount" shall be an amount equal to fifty percent (50%) of the Net Rental Income. For the purpose hereof, "Net Rental Income" shall mean the gross rental income received by Buyers from the rental of the Units, less any sums paid to third parties other than Buyers. Upon the receipt of each Monthly Statement by Escrow Agent from Buyers, Escrow Agent shall disburse from the Escrow Account (to the respective Buyers) the Monthly Guaranty Payment as requested by the Monthly Statement. The amount of each Monthly Guaranty Payment request shall be conclusively determined to be correct and Escrow Agent may rely solely upon the Monthly Statement (without any further duty or obligation to make inquiry as to the calculation thereof). Within 5 days after the receipt of each Monthly Statement, Escrow Agent shall disburse to Buyer the requested Monthly Guaranty Payment without notice to or any written confirmation or approval from Seller.

4.      On the last day of the Escrow Period, Escrow Agent shall deliver any remaining sums in the Escrow Account to Seller. The parties agree that this Agreement does not constitute a guarantee by either Escrow Agent or by Seller as to any particular amount of income to be generated by the rental of the Units, and is solely limited to the timing of payment of sums from the Escrow Account.

5.      Escrow Agent hereby agrees to provide to Buyer with a Monthly Reconciliation reflecting sums distributed from Escrow Account to Buyer. No party other than Buyer shall be entitled to any distributions form the Escrow Account prior to the end of the Escrow Period.

6.      In the event of any inconsistency between any Purchase Agreement and this Guarantee Agreement, the provisions of this Guaranty Agreement shall control.

7.      This Guaranty Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement, and the signatures of any part to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.

**Exhibit 3**

For purposes of executing this Guaranty Agreement, documents signed and transmitted by facsimile machine shall be treated as an original document.

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Guarantee Agreement effective as of the date first above written.

"BUYER"                                          "SELLER"

                                                 TERREMARK BRICKELL II, LTD., a Florida
                                                 limited partnership

                                                 By: _____
_____                      Name: _____
     Emanuel Organek                             Title: _____


GLK L.P., a Washington limited partnership

By:   Gold Luck Trading Corporation,
      General Partner

By: _____
      Debbi Eisner, President

         [Corporate Seal]

N:\GSA\Confidential\Four Season Units\AMENDGUARANTYAGR.doc

-2-

For purposes of executing this Guaranty Agreement, documents signed and transmitted by facsimile machine shall be treated as an original document.

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Guarantee Agreement effective as of the date first above written.

"BUYER"

"SELLER"

TERREMARK BRICKELL II, LTD., a Florida limited partnership

By: _____

_____
Emanuel Organek

Name: _____

Title: _____

GLK L.P., a Washington limited partnership

By:   Gold Luck Trading Corporation,
      General Partner

By: _Debbi Eisner_
      Debbi Eisner, President

(Corporate Seal)

M:\GMAC\Interim\IPar Season Units\AMENDGUARANTYAGR.doc

For purposes of executing this Guaranty Agreement, documents signed and transmitted by facsimile machine shall be treated as an original document.

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Guarantee Agreement effective as of the date first above written.

"BUYER"                                          "SELLER"

                                                 TERREMARK BRICKELL II, LTD., a Florida
                                                 limited partnership

                                                 By:
_____                          Name: Richard Baument
Emanuel Organek                                  Title: Vice President

GLK, L.P., a Washington limited partnership

By:   Gold Luck Trading Corporation,
      General Partner

By: _____
    Debbi Eisner, President

      (Corporate Seal)

N:\GSM\Continental\Four Season Units\AMENDGUARANTYAGR.d

-2-